[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 18, 2003
THOMAS K. KAHN
CLERK

_____

No. 02-10555
_____

D. C. Docket No. 01-01953-CV-UUB

NATIONAL PARKS CONSERVATION
ASSOCIATION, TROPICAL
AUDUBON SOCIETY,

                                        Plaintiffs-Appellants,

versus

GAIL NORTON, as Secretary of the United
States Department of the Interior, and
FRAN P. MAINELLA, as Director of the
National Park Service,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(March 18, 2003)**

Before CARNES, MARCUS and SUHRHEINRICH*, Circuit Judges.

_____

*Honorable Richard F. Suhrheinrich, United States Circuit Judge for the Sixth Circuit, sitting by designation.

MARCUS, Circuit Judge:

This case centers around the fate of "Stiltsville," a collection of stilted buildings located in Biscayne Bay, off the southern coast of Key Biscayne, Florida. These buildings presently rest within the boundaries of Biscayne National Park, and accordingly the National Park Service ("NPS") is charged with their administration. However, in 1976, prior to the assumption by the NPS of responsibility for their management,[1] the structures were leased by the State of Florida to individual occupants for 23 year terms. These leases expressly provided that upon their expiration on July 1, 1999 the Stiltsville structures would be removed. As this deadline approached, however, the lessees of these buildings successfully undertook to extend their exclusive occupancy.

On May 14, 2001, appellants the National Parks Conservation Association ("NPCA") and Tropical Audubon Society ("TAS") responded to the lessees' efforts by filing this action in the United States District Court for the Southern District of Florida. They alleged that the NPS's failure to discontinue the exclusive private use of the Stiltsville structures violated the National Park Service Organic Act ("Organic Act"), 16 U.S.C. § 1 et seq., the Biscayne National Park

---

[1] In 1976 the boundaries of Biscayne National Park had not yet been expanded to encompass Stiltsville, and the State of Florida was responsible for managing the structures. A more complete account of Stiltsville's history is set forth, infra.

2

General Management Plan ("General Management Plan"), the National

Environmental Protection Act ("NEPA"), 42 U.S.C. § 4321 et seq., several of the

administrative regulations that attend the Organic Act and the NEPA and the equal

protection component of the Fifth Amendment. With the exception of the equal

protection claim, which they brought under the Due Process Clause of the Fifth

Amendment, NPCA and TAS advanced each of their claims under the

Administrative Procedures Act ("APA"), 5 U.S.C. § 706(1) & 2(A). Appellants

sought to compel the NPS[2] to either remove the structures or make them accessible

to the public.

The district court granted summary judgment to the NPS on all of

appellants' claims. It reasoned that it lacked subject matter jurisdiction under the

APA because decisions whether and how to comply with the Organic Act, General

Management Plan, NEPA and their implementing regulations are vested entirely

within the NPS's discretion. Accordingly, the court applied the APA's

"committed to agency discretion" exception to the rule providing for judicial

review of administrative action. See 5 U.S.C. § 701(a)(2); Heckler v. Chaney, 470

U.S. 821, 828-35, 105 S. Ct. 1649, 1654-58, 84 L. Ed. 2d 714 (1985). The district

---

[2]Although this suit technically is brought against both the Department of the Interior ("DOI") and the NPS, the NPS simply is a subdivision of the DOI, and accordingly we will refer in this opinion to the NPS as the appellee in the case.

court also held that appellants lacked standing to advance their Fifth Amendment equal protection claim. NPCA and TAS appeal both of these holdings.

After thorough review, we find that the district court's conclusion that appellants' APA claims were non-justiciable was correct, as was the entry of final summary judgment for appellee on appellants' equal protection claim. However, we base both of these results on different grounds than were relied on by the district court. See Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1256 (11th Cir. 2001) (noting that "we may affirm [the district court's] judgment 'on any ground that finds support in the record'" (quoting Jaffke v. Dunham, 352 U.S. 280, 281, 77 S. Ct. 307, 308, 1 L. Ed. 2d 314 (1957))). In particular, we conclude that we lack subject matter jurisdiction over appellants' APA claims because the NPS has not taken any action vis-a-vis the future management of Stiltsville that can be considered "final" within the meaning of 5 U.S.C. § 704. Furthermore, although NPCA and TAS enjoy standing to pursue their equal protection claim, that claim is unavailing on its merits.

I.

"Stiltsville" is a collection of structures constructed on stilts in the shallow waters of Biscayne Bay south of Key Biscayne, Florida. The buildings are largely

4

weekend homes, restaurants and nightclubs that were built by wealthy individuals beginning in the 1930s. By 1945 there were 14 stilted structures in the bay, and by the 1960s there were 27 such structures in relatively close proximity to each other, and this collection of buildings became known as "Stiltsville." Over the years, the majority of these structures have been destroyed by hurricanes, and today only 7 remain in existence.

During the mid-1960s, the Florida Department of Natural Resources asserted its jurisdiction over the state-owned submerged lands on which Stiltsville rests, and issued to private individuals renewable year-to-year leases for the structures at nominal rent. Subsequently, in 1968 Congress established Biscayne National Monument, the northern boundary of which was approximately five miles south of the Stiltsville structures. Congress created the Monument "to preserve and protect for the education, inspiration, recreation, and enjoyment of present and future generations a rare combination of terrestrial, marine, and amphibious life in a tropical setting of great natural beauty." Pub. L. No. 90-606, § 1, 82 Stat. 1188 (1968). In 1976, the State of Florida replaced the year-to-year leases with exclusive "Campsite leases" that expired on July 1, 1999 and set the rent at $700 per year. These agreements expressly provided that the lessees

forfeited all rights to the buildings other than those provided for in the leases, and that the structures were to be removed by the lessor upon the leases' expiration.

In 1980, Congress passed the Biscayne National Park Enabling Act ("Enabling Act"), 16 U.S.C. §§ 410gg et seq., which converted Biscayne National Monument into Biscayne National Park. The Park encompasses 71,000 acres that the Monument did not, including the area in which Stiltsville is located. The Enabling Act directed the Park Service to "preserve and administer the park in accordance with the provisions" of the National Park Service Organic Act ("Organic Act"), 16 U.S.C. § 1, and to develop a revised management plan for the new park. Accordingly, in 1983 the NPS issued "[t]he General Management Plan, Development Concept Plan, Wilderness Study and Environmental Assessment" for Biscayne National Park. This Plan was prepared with public notice and comment after the completion of environmental review as required by the NEPA, and it remains in effect. The Plan states that the Stiltsville buildings and surrounding area will be managed as a natural area for the protection of the natural resources within the Park, that the leases pertaining to the structures will expire on July 1, 1999 and cannot be renewed, and that the buildings are to be removed upon the expiration of the leases. However, the Plan does not specify the method or exact timing of the removal. In 1985, Florida deeded to the federal government

6

the submerged lands on which Stiltsville sits, an action that resulted in the NPS becoming landlord for the leaseholders.[3]

From the execution of the "campsite leases" in 1976 until near the end of the 23 year lease term, the structures were occupied without incident. However, as the July 1, 1999 expiration date approached, the leaseholders undertook a series of actions aimed at preserving their exclusive use of the buildings. They twice filed with the Keeper of the National Register applications to have the buildings listed in the National Register of Historic Places. These applications were opposed by the NPS and both ultimately were denied. Then, on June 29, 1999, with the threat of a lawsuit looming, appellee and the leaseholders entered into a "Standstill Agreement" which provided for the continued private occupancy of the buildings until December 1, 1999. On November 22, 1999, this agreement was extended through November 29, 2000. Subsequently, bills were introduced in both the 106th and 107th Congresses to modify the borders of Biscayne National Park to exclude Stiltsville, see H.R. 1002, 107th Cong. (1st Sess. 2001); H.R. 3033, 106th Cong. (2d Sess. 2000), but neither of these measures passed.

---

[3]Florida donated this land "subject to outstanding easements, reservations, or interests appearing of record," thereby ensuring that the 1976 leases remained binding following the transfer.

As the November 29, 2000 extended deadline neared, the Stiltsville occupants filed two separate actions in the United States District Court for the Southern District of Florida in an effort to forestall the termination of their leases. These were captioned Bay Chateau, Inc. v. United States, No. 00-4529 (S.D. Fla. 2000) and Miami Springs Power Boat Club v. United States, No. 00-4518 (S.D. Fla. 2000), and in each the plaintiff leaseholders claimed that the NPS lacked authority under the 1976 leases to evict them. On November 29, 2000 the district court entered a temporary restraining order preventing the NPS from moving to evict the Stiltsville residents, and then on December 18, 2000 the court converted the TRO into a preliminary injunction that remained in place until April 1, 2001. That same month, while these suits were pending, Congress passed an appropriations rider extending the second Standstill Agreement until March 31, 2001. See Pub. L. No. 106-554, § 129, 114 Stat. 2763, 2763A-230 (2000).

On March 31, 2001, the parties settled the Miami Springs Power Boat Club and Bay Chateau cases. The settlement agreement required the NPS to forebear from evicting the leaseholders until April 1, 2002. In addition, the agreement expressly provided that it "does not constitute a transfer or conveyance by the United States of any right, title, or interest to the Stiltsville Occupants."

8

Against this background, on May 14, 2001 the National Parks Conservation Association and the Tropical Audubon Society filed this suit under the APA, 5 U.S.C. § 706(1) & (2)(A), and the Due Process Clause of the Fifth Amendment. They alleged that the NPS's repeated acquiescence in the Standstill Agreements and other failures to evict the Stiltsville leaseholders upon the expiration of the campsite leases were tantamount to the grant of an exclusive lease to the buildings' occupants. Appellants claimed that this inaction by the NPS violated the Organic Act, the General Management Plan, the NEPA, several administrative regulations that attend these provisions and the equal protection component of the Fifth Amendment Due Process Clause. The parties filed cross motions for summary judgment, and although the district court denied appellants' motion it granted summary judgment in favor of the NPS. The court reasoned that although the APA provides for judicial review of agency action that is final or that is specifically made reviewable by statute, there are two notable statutory exceptions to this general proposition. Under 5 U.S.C. § 701(a), judicial review is unavailable where "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." The district court quickly concluded that judicial review was not prohibited under any of the substantive statutes that

9

plaintiffs alleged the NPS to have violated, which left as potentially applicable only the exception codified at § 701(a)(2).

In Heckler, the Supreme Court held that judicial "review is not to be had [under § 701(a)(2)] if the statute [in question] is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." 470 U.S. at 830, 105 S. Ct. at 1655. Relying on Heckler's exposition of the "committed to agency discretion" exception, the district court in this case determined that none of the statutory provisions that allegedly had been violated by the NPS contained a standard that was sufficiently definite to permit meaningful judicial review. In fact, the district court held that "'Congress delegated the entire area of parks management to the' Secretary of the Interior." District Court's opinion at 11 (quoting Maloney v. Sheehan, 453 F. Supp. 1131, 1140 (D. Conn. 1978)). Although the court "acknowledge[d]" appellants' contention that the Organic Act supplies a meaningful standard for judicial review, it held that this Act "merely establishes a series of general directives to" promote and regulate the National Parks. The Organic Act, the court continued, is silent as to the means by which this promotion and regulation are to be realized. The district court also noted that the only discernible congressional policy regarding the Stiltsville leases is consistent with the NPS's inaction, as evidenced by

10

Congress's direction to extend the Standstill Agreement until March 21, 2001. Based on this analysis, the court concluded that neither the Organic Act, the General Management Plan nor the NEPA supplies a meaningful standard against which to review appellees' failure to evict the Stiltsville occupants. As such, it held that appellants' claims sounding in the violation of these statutes were unreviewable by a court. As for their equal protection claim, the district court held that NPCA and TAS lacked standing to vindicate the interest of all members of the public in fully enjoying Biscayne National Park. Accordingly, it determined that it lacked subject matter jurisdiction over this claim.

Based on the foregoing analysis, the district court granted summary judgment in favor of the NPS, and it is from this order that NPCA and TAS presently appeal. On appeal, NPCA and TAS argue that this case is readily distinguishable from Heckler, where the FDA was held to have absolute discretion whether to undertake enforcement activities, as the NPS is not afforded discretion under the Organic Act, General Management Plan or NEPA. As a corollary of this argument, appellants note that the exception codified at 5 U.S.C. § 701(a)(2) is narrow in scope, and contend that these enactments do provide a meaningful and altogether sufficient standard against which to review appellees' inaction. They also assert that the district court erred by holding that they lack standing to

advance their Fifth Amendment equal protection claim, as they seek not to vindicate the rights of the public at large, but rather of their membership specifically.

In response, appellees advance three primary arguments. First, seeking to analogize their inaction to the inaction of the FDA that was at issue in <u>Heckler</u>, they characterize their failure to terminate the Stiltsville leases as a wholly discretionary decision not to exert their enforcement power. As such, they say, this decision is entirely unreviewable by a court under § 701(a)(2). Second, appellees assert that judicial review may be had only of <u>final</u> agency actions, and that their decision not to evict the Stiltsville leaseholders is non-final. Finally, they contend that appellants' claims are not ripe. Although the NPS does not defend the district court's determination that appellants lack standing to advance their Fifth Amendment equal protection claim, it argues that this claim is unavailing on its merits.

Before evaluating the central issues in this lawsuit, we observe that since the inception of this action the NPS has taken several meaningful steps toward the implementation of a permanent management plan for the Stiltsville structures. In particular, appellee asserts that as the <u>Bay Chateau</u> and <u>Miami Springs Power Boat Club</u> litigation proceeded it began a "comprehensive and multi-faceted process for

12

reviewing the management of park resources, including Stiltsville, and evaluating potential management options for the future." The National Park Service observes that it published in the Federal Register a notice of intent to prepare a new management plan for Biscayne National Park and an attendant draft environmental impact statement ("DEIS"). See Intent to Prepare a Draft Environmental Impact Statement for the Stiltsville Management Plan, Biscayne National Park, 66 Fed. Reg. 65,989, 65,989-90 (Dec. 21, 2001). In this notice the NPS described its forthcoming plan as "guid[ing] public use and management of [the buildings]," id. at 65,989, with the attendant DEIS evaluating the potential environmental impacts associated with the management options being considered. The NPS also points to its establishment of a 22 member committee (which, notably, included a representative of TAS) to review alternatives for the future use and management of the Stiltsville structures. This committee held several public meetings during 2001 and 2002, see Meeting Notice, 67 Fed. Reg. 34,951, 34,951 (May 16, 2002) (announcing a May 29, 2002 public hearing); Notice of Intent, 67 Fed. Reg. 42,280, 42,280 (June 21, 2002) (noting that public hearings on Stiltsville had been conducted on September 24th and 25th, 2001), and ultimately submitted a report to the NPS.

Most importantly, roughly 6 weeks prior to oral argument in this case appellee promulgated both the planned amendment to the General Management Plan, in which it outlines four management alternatives for Stiltsville, and a DEIS that evaluates each of these options. See Notice of Availability, 67 Fed. Reg. 71,980, 71,981 (Dec. 3, 2002) (announcing the availability of these documents); Biscayne National Park General Management Plan Amendment and Draft Environmental Impact Statement, available at http://www.nps.gov/bisc/stiltsville/stiltsvillewhatsnew.htm (last visited Feb. 26, 2003). The period for public comment on these alternatives and the DEIS expired on February 13, 2003, and appellee presently is reviewing the public's feedback as a preface to making a final decision regarding Stiltsville's future. At oral argument we asked the parties to submit briefs proposing a timeframe for an ultimate, binding decision as to the prospective management of the structures. Notably, the NPS says that it anticipates making a final decision by "[m]id-May," and appellants have indicated this timeframe is a reasonable one from their perspective.

Against this background, we address the merits of the parties' arguments.

II.

We review a summary judgment ruling de novo, applying the same legal standard used by the district court. See Johnson v. Bd. of Regents, 263 F.3d 1234, 1242-43 (11th Cir. 2001). In conducting this examination, we view the materials presented and all factual inferences in the light most favorable to the non-moving party. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed.2d 142 (1970). Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of demonstrating the satisfaction of this standard lies with the movant, who must present "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" that establish the absence of any genuine, material factual dispute. Id.

A.

As a general rule, actions taken by federal administrative agencies are subject to judicial review. 5 U.S.C. § 706; Abbott Labs. v. Gardner, 387 U.S. 136, 140-41, 87 S. Ct. 1507, 1511, 18 L. Ed. 2d 681 (1967), overruled on other

15

grounds, Califano v. Sanders, 430 U.S. 99, 105, 97 S. Ct. 980, 984, 51 L. Ed. 2d 192 (1977).  However, as the district court noted, under 5 U.S.C. § 701(a) federal courts lack jurisdiction over administrative action where "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."  Notably, these are not the only circumstances under which federal courts cannot review an agency's acts; as is especially relevant in the present context, federal jurisdiction is similarly lacking when the administrative action in question is not "final" within the meaning of 5 U.S.C. § 704.  See Independent Petroleum Ass'n of Am. v. Babbitt, 235 F.3d 588, 594 (D.C. Cir. 2001) ("'[T]he requirement of a final agency action has been considered jurisdictional.  If the agency action is not final, the court therefore cannot reach the merits of the dispute.'" (quoting DRG Funding Corp. v. Sec. of Hous. & Urban Dev., 76 F.3d 1212, 1214 (D.C. Cir. 1996))).  This section provides in pertinent part that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.  A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."  5 U.S.C. § 704.

In Bennett v. Spear, the Supreme Court delineated the contours of the "final agency action" requirement.  It held:

16

> As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decisionmaking process, -- it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

520 U.S. 154, 177-78, 117 S. Ct. 1154, 1168, 137 L. Ed. 2d 281 (1997) (quoting Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113, 68 S. Ct. 431, 437, 92 L. Ed. 568 (1948) and Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71, 91 S. Ct. 203, 209, 27 L. Ed. 2d 203 (1970)); see also Darby v. Cisneros, 509 U.S. 137, 144, 113 S. Ct. 2539, 2543, 125 L. Ed. 2d 113 (1993) ("'[T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury . . . .'" (quoting Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 193, 105 S. Ct. 3108, 3120, 87 L. Ed. 2d 126 (1985))); Franklin v. Massachusetts, 505 U.S. 788, 797, 112 S. Ct. 2767, 2773, 120 L. Ed. 2d 636 (1992) ("The core question [in the finality determination] is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."). By contrast, "the Supreme Court has defined a nonfinal agency order as one that 'does not itself adversely affect complainant but only affects his rights

adversely on the contingency of future administrative action.'" American

Airlines, Inc. v. Herman, 176 F.3d 283, 288 (5th Cir. 1999) (quoting Rochester Tel.

Corp. v. United States, 307 U.S. 125, 130, 59 S. Ct. 754, 757, 83 L. Ed. 1147

(1939)).

In Bennett, which featured a challenge to a position set forth in a Federal

Fish and Wildlife Service Biological Opinion, the Supreme Court distinguished

the case at bar from two previous decisions in which the Court had held the

administrative action in question to be non-final under § 704.  See 520 U.S. at 178,

117 S. Ct. at 1168-69 (distinguishing Franklin, 505 U.S. 788, 112 S. Ct. 2767 and

Dalton v. Specter, 511 U.S. 462, 114 S. Ct. 1719, 128 L. Ed. 2d 497 (1994)).  It

said:

> In the former case [Franklin], the agency action in question was the
> Secretary of Commerce's presentation to the President of a report
> tabulating the results of the decennial census; our holding that this did
> not constitute "final agency action" was premised on the observation
> that the report carried no direct consequences and served more like a
> tentative recommendation than a final and binding determination.
> And in the latter case [Dalton], the agency action in question was
> submission to the President of base closure recommendations by the
> Secretary of Defense and the Defense Base Closure and Realignment
> Commission; our holding that this was not "final agency action"
> followed from the fact that the recommendations were in no way
> binding on the President, who had absolute discretion to accept or
> reject them.

18

Id. (internal citations and punctuation omitted). The Court concluded in Bennett that § 704's "final agency action" requirement was satisfied in that case because "[u]nlike the reports in Franklin and Dalton, which were purely advisory and in no way affected the legal rights of the relevant actors, the Biological Opinion at issue here has direct and appreciable legal consequences." 520 U.S. at 178, 117 S. Ct. at 1169.

Upon applying these general principles to the facts of this case, we conclude that the NPS's failure to discontinue the private occupancy of the Stiltsville structures cannot be considered "final agency action" within the meaning of § 704. Preliminarily, we note that although appellee may have acted less than expeditiously in its planning for Stiltsville's future since the expiration of the campsite leases on July 1, 1999, not all of the blame for the delay in implementing a management plan can be properly attributed to the NPS. Indeed, from November 29, 2001 through April 1, 2002, appellee was expressly barred by judicial order and subsequently barred by both judicial order and legislative mandate from disturbing the Stiltsville occupants' exclusive access to the structures. Even had the NPS been disposed to act during this period it was forbidden from doing so.

Moreover, as we have explained at some length, the NPS is actively planning the prospective management of Stiltsville. Specifically, it has crafted four management alternatives for Stiltsville and a draft EIS that evaluates each of these options. See Biscayne National Park General Management Plan Amendment and Draft Environmental Impact Statement, available at http://www.nps.gov./bisc/stiltsville/stiltsvillewhatsnew.htm. This document is 238 pages long, and plainly reflects a great deal of care and effort in its formulation. We find it notable that none of the four options being considered provide for the continued private occupancy of the structures. Finally, we again observe that appellee has assured this court that its decisionmaking process will be completed by mid-May, 2003. Simply put, although to date it has made no final decision, it is indisputable that the NPS is actively engaged in planning, and has set an anticipated date for resolving, Stiltsville's future, and none of the management alternatives under active consideration would maintain the status quo that appellants find to be objectionable.

Under these circumstances, we cannot conclude that the NPS has taken any final action or engaged in a pattern of inaction that can be said to "mark the 'consummation' of the agency's decisionmaking process" or to be "one by which 'rights or obligations have been determined,' or from which 'legal consequences

20

will flow.'" Bennett, 520 U.S. at 177-78, 117 S. Ct. at 1168 (citations omitted); see also Darby, 509 U.S. at 144, 113 S. Ct. at 2543 (holding that administrative action will be considered "final" only if the agency "has arrived at a definitive position on the issue" in question) (citation omitted). It is beyond any doubt that further administrative action is forthcoming: one of the four proposed management alternatives will soon be selected and implemented. As such, nothing that the NPS has done (or refused to do) to date can be deemed the "consummation" of its decisionmaking process. See, e.g., City of San Diego v. Whitman, 242 F.3d 1097, 1101 (9th Cir. 2001) (holding that an EPA opinion letter did not constitute "final agency action" with respect to the appellant's then unfiled application for renewal of a modified National Pollutant Discharge Elimination System permit because there were several administrative steps that necessarily would be taken before the application, once filed, would be conclusively approved or denied); Mobil Exploration & Producing U.S., Inc. v. Dept. of Interior, 180 F.3d 1192, 1198 (10th Cir. 1999) (holding that a United States Minerals Management Service letter did not represent "final agency action" because it "served only to initiate further proceedings by which the MMS could [conclusively] determine whether Plaintiffs owed royalties").

Similarly, because the agency has done nothing beyond establishing a committee to review alternatives for the future use and management of Stiltsville, formulating management options and submitting those plans for public comment, no rights or obligations have been fixed by its behavior, nor has it taken (or refused to take) action so as to impose any legal consequence on any party. It has generated prospective governance proposals, nothing more and nothing less. This is precisely the sort of "tentative" behavior characterized by the Supreme Court in Bennett as falling short of the "final agency action" bar. 520 U.S. at 178, 117 S. Ct. at 1168.

A telling comparison may be made between the facts of this case and those at issue in Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 478-79, 121 S. Ct. 903, 915, 149 L. Ed. 1 (2001). Whitman featured a challenge to the EPA's 1997 revisions to its national ambient air quality standards for particulate matter and ozone. The EPA argued that the Court lacked subject matter jurisdiction over the challenge because these standards did not represent reviewable "final agency action." In rejecting this contention, the Supreme Court said:

> Only if the "EPA has rendered its last word on the matter" in question, is its action "final" and thus reviewable. That standard is satisfied here. The EPA's "decisionmaking process," which began with the 1996 proposal and continued with the reception of public comments, concluded when the agency, "in light of [these

comments]," and in conjunction with a corresponding directive from the White House, adopted the interpretation . . . at issue here. Since that interpretation issued, the EPA has refused in subsequent rulemakings to reconsider it, explaining to disappointed commenters that its earlier decision was conclusive.

Id. (quoting Harrison v. PPG Indus., Inc., 446 U.S. 578, 586, 100 S. Ct. 1889, 1894, 64 L. Ed. 2d 525 (1980)) (other citations omitted). In the present case, by contrast, the NPS has yet to select any of the four management plans and, indeed, remains busily engaged in the process of charting the course of Stiltsville's future. Although the NPS has completed its receipt of public commentary on its four alternatives, as the EPA had in Whitman, it has yet to "adopt" one of them. Thus, the critical step that rendered the EPA's standards reviewable in Whitman is absent here. Nothing remotely resembling the NPS's final word on this matter has been rendered.

To the extent that appellants suggest that the length of the NPS's inaction in this case renders that inaction reviewable, we are unpersuaded. We agree, as a general matter, that an administrative agency cannot legitimately evade judicial review forever by continually postponing any consequence-laden action and then challenging federal jurisdiction on "final agency action" grounds. See, e.g., Cobell v. Norton, 240 F.3d 1081, 1095 (D.C. Cir. 2001) ("As this court has noted in the past, where an agency is under an unequivocal statutory duty to act, failure

23

so to act constitutes, in effect, an affirmative act that triggers 'final agency action' review. Were it otherwise, agencies could effectively prevent judicial review of their policy determinations by simply refusing to take final action.") (citations and internal punctuation omitted); Sierra Club v. Thomas, 828 F.2d 783, 793 (D.C. Cir. 1987) (noting that to deem unreviewable an agency's withholding of action that would be reviewable under the APA could be to permit the agency to "forever evade our review").

In this case, however, the NPS has not forestalled decisive action regarding Stiltsville's future such as would render its inaction reviewable. As we have explained, not all of the delay in implementing a management plan is attributable to the NPS; between November 29, 2000 and April 1, 2001 appellee was explicitly barred by judicial order and legislative mandate from taking any action with respect to the Stiltsville buildings. Additionally, as we also have discussed, the NPS has promulgated, and received public comment on, four management alternatives for the structures and a DEIS pertaining to each of these options. Finally and notably, appellee assures us that it will reach a final decision regarding the future of the Stiltsville buildings by "mid-May" of this year. Thus, the NPS is not presently "withh[olding] or . . . delay[ing]" final action at all. 5 U.S.C. § 706(1). Moreover, it is evident that the plan that the NPS ultimately adopts will

24

satisfy the concerns raised by appellants; none of the four alternatives that appellee is considering provide for the continued private occupancy of the Stiltsville buildings.

In sum, the NPS has undertaken -- but has not concluded -- the process of selecting and implementing a management plan for the buildings that comprise Stiltsville. Because appellee has not completed this undertaking, the actions that it has taken to date cannot be deemed the consummation of its decisionmaking process, and accordingly the Bennett test for "final agency action" is unsatisfied in this case. By contrast, because the NPS is (albeit after a lengthy period of inactivity) presently engaged in the aforementioned planning process, we are not confronted with reviewable administrative inaction. Accordingly, we lack subject matter jurisdiction over all of appellants' APA claims, i.e., those alleging violations of the Organic Act, NEPA, General Management Plan and numerous regulations that attend these provisions.

We stress, however, that our opinion should not be construed as tacit approval of any future inaction on the part of the NPS vis-a-vis the formulation and implementation of a final management plan for the Stiltsville buildings. We agree with the parties that appellee's proposed decisionmaking timeframe is reasonable, seeing no reason (barring any unforseen external influence, e.g.,

25

another judicial or legislative decree or some emergency) why a final management plan for Stiltsville cannot be decisively implemented by the start of June of this year. Should this matter not be finally resolved by then, NPCA and TAS may renew their APA claims.

Based on these conclusions, we find it unnecessary to address appellee's contentions regarding ripeness or the applicability of 5 U.S.C. § 701(a)(2) in this case. Indeed, we offer no opinion as to the merits of the district court's holding regarding the APA's "committed to agency discretion" provision. However, because the "final agency action" requirement implicates federal subject matter jurisdiction, the district court's entry of summary judgment for the NPS on appellants' APA claims was improper as a procedural matter. This is so because "[i]f the court has no jurisdiction, it has no power to enter a judgment on the merits and must dismiss the action." 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2713, at 239 (3d ed. 1998); see also Whitt v. Sherman Int'l Corp., 147 F.3d 1325, 1333 (11ᵗʰ Cir. 1998) (holding that because "federal jurisdiction cannot be found, . . . the district court's entry of summary judgment was a nullity"). Instead of entering summary judgment in favor of appellee, the district court should have dismissed appellants' APA claims, sua sponte if necessary, pursuant to Fed. R. Civ. P. 12(h)(3). Accordingly, although we

26

agree with the court's conclusion regarding the justiciability of these claims, although for wholly different reasons, we vacate its order of summary judgment and remand to the district court with instructions to dismiss these claims pursuant to Fed. R. Civ. P. 12(h)(3), which provides that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."  See also Fed. R. Civ. P. 12(b)(1) (providing for the dismissal of an action upon motion of a party where the court lacks jurisdiction over the subject matter of the dispute) .

B.

Notably, however, this does not dispose of appellants' equal protection claim;[4] because this claim is brought directly under the Due Process Clause of the Fifth Amendment, see Davis v. Passman, 442 U.S. 228, 242-43, 99 S. Ct. 2264, 2275-76, 60 L. Ed. 846 (1979), and not under the APA, the "final agency action"

_____

[4]Of course, when we discuss a "Fifth Amendment equal protection" claim, we actually are concerned with a Fourteenth Amendment equal protection claim that has been "reverse-incorporated" into the Fifth Amendment's Due Process Clause.  See Bolling v. Sharpe, 347 U.S. 497, 499-500, 74 S. Ct. 693, 694-95, 98 L. Ed. 884 (1954); Fernandez-Bernal v. Attorney Gen., 257 F.3d 1304, 1312 (11th Cir. 2001) ("[T]he Due Process Clause of the Fifth Amendment incorporates the guarantees of equal protection."); Rodriguez ex rel. Rodriguez v. United States, 169 F.3d 1342, 1348 (11th Cir. 1999) (discussing "the Due Process Clause of the Fifth Amendment []and the equal protection principles it incorporates[]").

27

requirement is inapplicable to it.  See generally Ukiah Valley Med. Ctr. v. FTC, 911 F.2d 261, 264 n.1 (9ᵗʰ Cir. 1990) ("[A] finding of finality, or of an applicable exception, is essential when the court's reviewing authority depends on one of the many statutes permitting appeal only of "final" agency action, such as § 10 of the APA,  5 U.S.C. § 704.").  Accordingly, we review the district court's order of summary judgment for appellee on this claim separately.

Ultimately, we conclude that although the district court erred by finding that appellants lack standing to advance their equal protection challenge -- and that federal subject matter jurisdiction consequently exists over this claim -- the challenge is unavailing on its merits.  Thus, we affirm the district court's summary judgment as to this claim, albeit on grounds other than those on which it relied.

In Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992), the Supreme Court set forth the test for Article III standing.  First, the plaintiff must have suffered an "injury in fact," or "an invasion of a legally protected interest which is . . . concrete and particularized." Id. at 560, 112 S. Ct. at 2136.  Second, the plaintiff must demonstrate the existence of a causal connection between the injury and the conduct complained of, see id., and finally, it is necessary to establish that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  Id. at 561, 112 S. Ct. at

28

2136 (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 41-42, 96 S. Ct. 1917, 1926, 48 L. Ed. 2d 450 (1976)). Furthermore, where a plaintiff seeks prospective injunctive relief, it must demonstrate a "real and immediate threat" of future injury in order to satisfy the "injury in fact" requirement. City of Los Angeles v. Lyons, 461 U.S. 95, 103-04, 103 S. Ct. 1660, 1665-66, 75 L. Ed. 2d 675 (1983); Wooden v. Bd. of Regents, 247 F.3d 1262, 1283-84 (11th Cir. 2001).

In this case, the district court found that appellants' equal protection claim failed to satisfy Defenders of Wildlife's first prong, characterizing it as having been brought on behalf of "all . . . members of the public, locally and nationally, who wish to utilize the Stiltsville structures and to have an equal opportunity for enjoyment of [Biscayne National] Park and its resources." The court reasoned that because NPCA and TAS sought to vindicate the rights of the public as a whole, as opposed to those possessed by their members specifically, they had failed to demonstrate the existence of a particularized harm such as is necessary to establish Article III standing. See Defenders of Wildlife, 504 U.S. at 573-74, 112 S. Ct. at 2143 ("We have consistently held that a plaintiff raising only a generally available grievance about government -- claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that

29

no more directly and tangibly benefits him than it does the public at large -- does not state an Article III case or controversy.").

Appellants argue that the district court mischaracterized their claim. They point to their submission of "unrebutted affidavits . . . to the [d]istrict [c]ourt which attest to the injury that each individual member [of these organizations] suffers by the government's unlawful actions." They then argue, based on their members' satisfaction of the Article III standing test, that they enjoy associational standing under Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441, 53 L. Ed. 2d 383 (1977).

After considering these arguments, we conclude that the district court erred in dismissing appellants' Fifth Amendment equal protection claim for lack of standing. Preliminarily, we note that because the constitutional standing doctrine stems directly from Article III's "case or controversy" requirement, see Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 771, 120 S. Ct. 1858, 1861-62, 146 L. Ed. 2d 836 (2000), this issue implicates our subject matter jurisdiction, and accordingly must be addressed as a threshold matter

regardless of whether it is raised by the parties.[5]  Juidice v. Vail, 430 U.S. 327, 331, 97 S. Ct. 1211, 1215, 51 L. Ed. 2d 376 (1977).

It is true that in their complaint NPCA and TAS allege harm to "all . . . members of the public, locally and nationally [other than the present Stiltsville occupants], who wish to utilize the Stiltsville structures."  Moreover, it is unquestionable -- and indeed, appellants do not argue contrarily -- that taken alone this allegation is insufficient to establish Article III standing.  See Defenders of Wildlife, 504 U.S. at 573-74, 112 S. Ct. at 2143.  However, at the summary judgment stage of litigation -- as in the context of a factual challenge to federal subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) -- we are obliged to consider not only the pleadings, but to examine the record as a whole to determine whether we are empowered to adjudicate the matter at hand.  Fed. R. Civ. P. 56(c) (requiring the court to consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," in adjudicating a summary judgment motion); Garcia v. Copenhaver, Bell & Assocs., 104 F.3d 1256, 1261 (11th Cir. 1997) ("'"Factual attacks" . . . challenge "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and

_____

[5]We make this point because on appeal appellee does not defend the district court's standing determination, opting instead to argue the merits of the equal protection claim.

31

matters outside the pleadings, such as testimony and affidavits, are considered."'" (quoting Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990))).

In this case, prior to the filing of appellee's summary judgment motion appellants submitted the aforementioned affidavits. The affiants were several NPCA and TAS members who had visited Biscayne National Park (and specifically the area that includes Stiltsville) with frequencies ranging from once per month to fifty times per year, each of whom indicated an intent to maintain the frequency of these visits in the future. Each affiant specifically averred that his or her lack of access to Stiltsville or its surrounding environs impairs his or her recreational and aesthetic enjoyment of the park. They further alleged that the injuries they suffer as a result of the NPS's failure to discontinue the exclusive private use of the structures is continually present when they are at or near Stiltsville.

These statements satisfy the requirement that the plaintiffs suffer "concrete and particularized" harm. Defenders of Wildlife, 504 U.S. at 560, 112 S. Ct. at 2136; see also Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc., 528 U.S. 167, 183, 120 S. Ct. 693, 705, 145 L. Ed. 2d 610 (2000) ("We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." (citing Sierra Club

v. Morton, 405 U.S. 727, 735, 92 S. Ct. 1361, 1366, 31 L. Ed. 2d 636 (1972))).  As in Friends of the Earth, the harm suffered by the affiants in this case is more concrete than was the injury in Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).  In Nat'l Wildlife Fed'n, the Court held that "the plaintiff could not survive [a] summary judgment motion merely by offering 'averments which state only that one of [the organization's] members uses unspecified portions of an immense tract of territory, on some portions of which mining activity has occurred or probably will occur by virtue of the governmental action.'"  Friends of the Earth, 528 U.S. at 183, 120 S. Ct. at 705 (quoting Nat'l Wildlife Fed'n, 497 U.S. at 889, 110 S. Ct. at 3189).  In this case, by contrast, the affiants specify that they have repeatedly traveled to the site of the Stiltsville buildings in particular and on each such occasion have been harmed by their inability to enjoy either the structures or the natural environment surrounding them.

Nor is this a case in which the affiants have asserted only "'some day' intentions" to return to the site of their harm "without any description of concrete plans, or indeed even any specification of when the some day will be."  Defenders of Wildlife, 504 U.S. at 564, 112 S. Ct. at 2138 (emphasis in original).  The affiants state with particularity that they have definite plans to continue visiting Stiltsville with precisely the same frequency that they have to date, and that in the absence of

33

remedial action they will continue to experience the aesthetic and recreational harms described, supra. Quite simply, on this record the affiants have satisfied the concern expressed in Lyons that plaintiffs seeking prospective injunctive relief establish a "real and immediate threat" of future harm. 461 U.S. at 102, 103 S. Ct. at 1665.

We also note that the second and third prongs of the Article III standing inquiry plainly are satisfied in this case. Appellants allege that the injuries suffered by their members stem directly from the inability to enjoy the natural features of the area of Biscayne National Park on which the Stiltsville buildings rest, the lack of access to those structures and the aesthetic harm that is caused by the structures' presence in the park. There is no question that these harms, to varying extents, result from the continued, exclusive private occupancy of the structures, or that they would be remedied, again to different degrees, by the management alternatives being considered by appellee. In doctrinal terms, appellants have demonstrated that the injury suffered by their members "is fairly traceable to [conduct] of the defendant" and that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Alabama Power Co. v. United States Dept. of Energy, 307 F.3d 1300, 1308-09 (11th Cir. 2002) (citing Defenders of Wildlife, 504 U.S. at 560-61, 112 S. Ct. at 2136).

34

Although the foregoing analysis establishes that appellants' members possess Article III standing, it does not confirm that appellants themselves may sue. As the Supreme Court explained in Warth v. Seldin, 422 U.S. 490, 511, 95 S. Ct. 2197, 2211-12, 45 L. Ed. 2d 343 (1975), and subsequently refined in Hunt, an association may sue on behalf of its members when:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

432 U.S. at 343, 97 S. Ct. at 2441; see also United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 553, 116 S. Ct. 1529, 1534, 134 L. Ed. 2d 758 (1996).

This test is satisfied here. First, because the individual affiants allege concrete aesthetic and recreational harms that are directly traceable to the NPS's failure to end the exclusive private occupancy of the Stiltsville structures and would be redressible by a change in the status quo, they would have standing to sue in their own right. See Defenders of Wildlife, 504 U.S. at 560-61, 112 S. Ct. at 2136. Second, there is no question that the environmental, aesthetic and recreational benefits that would stem from the removal or at least discontinuing

35

the private occupancy of the Stiltsville buildings would be consistent with the organizational purposes of NPCA and TAS. Third, in no way must the individual affiants be made parties to this suit in order to advance the instant equal protection claim or to fashion the sort of prospective injunctive relief sought by appellants. Warth, 422 U.S. at 515, 95 S. Ct. at 2213 ("If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured."). Accordingly, under controlling precedent NPCA and TAS possess associational standing to advance a Fifth Amendment equal protection claim on behalf of their members.

Despite our conclusion that the district court's standing determination constituted error, we nonetheless affirm its grant of summary judgment for appellee when we consider the merits of the equal protection claim advanced by NPCA and TAS. When adjudicating a Fifth Amendment equal protection claim -- which is evaluated in precisely the same manner as an analogous claim under the Fourteenth Amendment, see Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2, 95 S. Ct. 1225, 1228 n.2, 43 L. Ed. 2d 514 (1975) -- we must determine at the outset the degree of scrutiny to which the classification in question is to be subjected. The Supreme Court has repeatedly said that when the government creates a

36

"suspect" classification of people, e.g., distinguishes between people along lines of race or alienage, that classification is subject to strict scrutiny. Under this searching review, the classification "<u>must</u> be held unlawful unless (1) the racial classification serves a compelling governmental interest, <u>and</u> (2) it is narrowly tailored to further that interest." <u>Johnson v. Bd. of Regents</u>, 263 F.3d 1234, 1244 (11th Cir. 2001) (citing <u>Adarand Constructors, Inc. v. Pena</u>, 515 U.S. 200, 227, 115 S. Ct. 2097, 2113, 132 L. Ed. 2d 158 (1995)) (emphasis original). Where, by contrast, the classification in question is drawn along "quasi-suspect" line, e.g., on the basis of gender, it will be subject to intermediate scrutiny. <u>Danskine v. Miami Dade Fire Dept.</u>, 253 F.3d 1288, 1293 (11th Cir. 2001). Under this standard, a "preference may be upheld so long as it is substantially related to an important governmental objective." <u>Id.</u> at 1294 (citation omitted).

In this case, however, neither of these standards are appropriate, as the classification in question is simply between the individuals who were party to the 1976 campsite leases and all other people who wish to enjoy either the portion of Biscayne National Park that currently is occupied by Stiltsville or the Stiltsville buildings themselves. This is neither a suspect nor a quasi-suspect classification, as those terms have been explicated by the Supreme Court. Accordingly, we employ only rational basis review in evaluating appellants' equal protection

37

challenge.  See Romer v. Evans, 517 U.S. 620, 631, 116 S. Ct. 1620, 1627, 134 L. Ed. 2d 855 (1996); Yeung v. INS, 76 F.3d 337, 339 (11th Cir. 1995).  Under this deferential standard, "we will uphold the legislative classification [in question] so long as it bears a rational relation to some legitimate end."  Romer, 517 U.S. at 631, 116 S. Ct. at 1627.  In making this determination:

> The first step . . . is identifying a legitimate government purpose -- a goal -- which the enacting government body could have been pursuing.  The actual motivations of the enacting governmental body are entirely irrelevant . . . .  The second step of rational-basis scrutiny asks whether a rational basis exists for the enacting governmental body to believe that the legislation would further the hypothesized purpose.  The proper inquiry is concerned with the existence of a conceivably rational basis, not whether that basis was actually considered by the legislative body. As long as reasons for the legislative classification may have been considered to be true, and the relationship between the classification and the goal is not so attenuated as to render the distinction arbitrary or irrational, the legislation survives rational-basis scrutiny.

Joel v. City of Orlando, 232 F.3d 1353, 1358 (11th Cir. 2000) (quoting Haves v. City of Miami, 52 F.3d 918, 921-22 (11th Cir. 1995)) (emphasis in original).

The NPS says that to the extent it has created a classification system that treats Stiltsville occupants differently from non-Stiltsville occupants, this serves the government's goal of "protect[ing] and maintain[ing] the stilted structures pending completing of the [NPS's] long-term planning process.  The temporary

preservation of the status quo to preserve options in a long-term planning process . . . is a legitimate government interest." As we said above, we need not inquire into the genuineness of appellee's proffered explanation of its classification, as we have no doubt that the NPS could have been attempting to temporarily maintain the structures pending the selection of one of its proposed management alternatives, or that this desire to keep its options open is a legitimate governmental end. See generally Romer, 517 U.S. at 632, 116 S. Ct. at 1627 (detailing various governmental purposes that have been considered legitimate). Moreover, the connection between the continued private occupancy of the structures and this goal is straightforward; the current Stiltsville leaseholders or their predecessors-in-interest have served as caretakers for the structures for over 25 years, and the temporary continuation of this arrangement is a minimally burdensome means of ensuring that such caretaking continues pending the implementation of a particular prospective management plan. Given this conclusion, our equal protection inquiry is at an end. See id. ("In the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous."); Harris v. McRae, 448 U.S. 297, 326, 100 S. Ct. 2671, 2693, 65 L. Ed. 2d 784 (1980) (noting that in conducting

rational basis review the only task of a federal court is to ensure that the classification in question is "rationally related to a legitimate governmental interest," and that "[i]t is not the mission of this Court or any other to decide whether the balance of competing interests reflected . . . is wise social policy").

Because there are no disputed factual questions that cast any doubt on the correctness of this outcome, the NPS is entitled to summary judgment on appellants' Fifth Amendment equal protection claim. Accordingly we affirm, albeit on different grounds.

### III.

To summarize, we hold that the NPS has neither taken any action with respect to the prospective management of the Stiltsville structures that can be deemed "final" within the meaning of 5 U.S.C. § 704, nor has it engaged in a pattern of reviewable administrative inaction. Accordingly, we presently lack subject matter jurisdiction over each of the claims brought by NPCA and TAS under the APA and remand to the district court with instructions to dismiss these claims pursuant to Fed. R. Civ. P. 12(h)(3); see also Fed. R. Civ. P. 12(b)(1). As a corollary of this disposition, we vacate the district court's order of final summary judgment as to these claims. Moreover, although the district court erred in holding

40

that appellants lack standing to advance their Fifth Amendment equal protection claim, this claim fails on the merits, and as such we affirm the court's summary judgment as to this claim.

**AFFIRMED IN PART, VACATED IN PART AND REMANDED WITH INSTRUCTIONS.**