MICCOSUKEE TRIBE OF INDIANS OF FLORIDA, a federally-recognized Indian Tribe, Plaintiff,

v.

UNITED STATES of America, et al., Defendants.

Case No. 08–23001–CIV.

United States District Court, S.D. Florida.

July 12, 2010.

Claudio Riedi, Felippe Moncarz, Kelly Brooks Smith, Lehtinen Riedi Brooks Moncarz, P.A., Janice Burton (Sibley) Sharpstein, Sonia Escobio O'Donnell, Jorden Burt LLP, Miami, FL, for Plaintiff.

Anna K. Stimmel, Mark A. Brown, John Brett Grosko, Terry M. Petrie, Ty Bair, U.S. Department of Justice, Washington, DC, for Defendants.

### *ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court upon Defendants' Motion for Summary Judgment (dkt. # 134).

UPON CONSIDERATION of the Motion, the Responses, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

## I. BACKGROUND

This case involves a federally-recognized Indian tribe claiming that certain water management actions by Defendants have caused high water levels on lands to which the Indian Tribe has rights, in violation of the Tribe's constitutional rights. Plaintiff Miccosukee Tribe of Indians of Florida (the "Miccosukee Tribe" or the "Tribe") is a federally recognized Indian Tribe residing on land in and near Everglades National Park. All "aboriginal" rights that the Miccosukee Tribe had to the lands were extinguished in 1982 as part of a court settlement between the United States and the Seminole Nation of Indians.[1] The Miccosukee Tribe now holds a perpetual leasehold (the "Lease") to a 189,000–acre tract of land (the "Leased Area") to the north of Everglades National Park. The Lease was granted to the Miccosukee Tribe in 1982 by the Board of Trustees of the State of Florida Internal Improvement Trust Fund.

The Leased Area is located within Water Conservation Area 3A ("WCA 3A"). WCA 3A is part of the Central and Southern Florida Project for Flood Control and Other Purposes (the "C & SF Project"). The C & SF Project was authorized by Congress in 1948 to control water flows and levels in South Florida and the Everglades, in order to provide both flood protection and water supply for the developed areas of South Florida. The C & SF Project is operated by The Army Corps of Engineers (the "Corps") and its local sponsor, The South Florida Water Management District ("SFWMD"). The C & SF Project directs water flow southward from

Lake Okeechobee to the Everglades. Some of this water passes through WCA 3A and the Leased Area. Water is released out of WCA 3A through a number of water management structures, including S–12A, S–12B, S–12C, S12D, and S–333. The released water from the S–12 gates goes into the L–28 canal and moves southward through numerous culverts under the Tamiami Trail and flows into Everglades National Park.

On October 28, 2008, the Miccosukee Tribe filed the instant Complaint (dkt. # 1), alleging that Defendants' water management actions have infringed on their constitutional and statutory rights by permitting high water levels to exist in the Leased Area. The Miccosukee Tribe's claims included violations of the Florida Indian Land Claims Settlement Act (Count I); Due Process (Count II); Action in the Nature of Mandamus (Count III); and Equal Protection (Count IV). In an Order dated September 16, 2009, 656 F.Supp.2d 1375 (S.D.Fla.2009), Granting in Part and Denying in Part Defendants' Motion to Dismiss (dkt. # 37), this Court dismissed Counts I, II and III, leaving only the equal protection claim.

## II. STANDARD OF REVIEW

The applicable standard for reviewing a summary judgment motion is unambiguously stated in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). Summary judgment may be entered only where there is no

---

**1.** The Miccosukee Tribe is a successor in interest to the Seminole Nation.

genuine issue of material fact. *Twiss v. Kury*, 25 F.3d 1551, 1554 (11th Cir.1994). The moving party has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.*

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Id.* However, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. ANALYSIS

### A. Standing

■ The Federal Defendants assert that the Miccosukee Tribe lacks standing to bring its equal protection claim. This Court has already concluded that the Miccosukee Tribe has parens patriae standing to bring its equal protection claim, and that even if the claim had been brought by an individual member of the Tribe, that individual would have had standing pursuant to *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119

L.Ed.2d 351 (1992). *Miccosukee Tribe of Indians of Fla. v. United States*, 680 F.Supp.2d 1308, 1314–15 (S.D.Fla.2010). This Court need not revisit its prior holding. Accordingly, the Federal Defendants' arguments concerning standing are without merit.

### B. Res Judicata

The Federal Defendants claim that the Miccosukee Tribe's equal protection claim is barred by the doctrine of res judicata. "Res judicata bars the filing of claims which were raised or could have been raised in an earlier proceeding." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1187 (11th Cir.2003) (internal quotation marks omitted). "The purpose behind the doctrine of res judicata is that the full and fair opportunity to litigate protects [a party's] adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1238 (11th Cir.1999) (internal quotation marks omitted). "The doctrine of res judicata, or claim preclusion, bars a litigant from raising claims that were raised or could have been raised in a prior action if: '(1) the prior decision was rendered by a court of competent jurisdiction; (2) there was a final judgment on the merits; (3) the parties were identical in both suits; and (4) the prior and present causes of action are the same.'" *DelVecchio v. Internal Revenue Serv.*, 360 Fed.Appx. 104, 109 (11th Cir.2010) (quoting *Davila*, 326 F.3d at 1187). "For purposes of res judicata, the prior and present cause of action are the same if they arise 'out of the same nucleus of operative fact, or [are] based upon the same factual predicate.'" *Id.* "Just what factual grouping constitutes a 'transaction' or what factual groupings constitute a 'series,' are to be determined pragmatically,

giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Ragsdale,* 193 F.3d at 1239 n. 8 (quoting Restatement (Second) of Judgments § 24(2) (1980)).

■■■ As an initial matter, any non-tort claim against the United States is barred unless it is brought within six years after the right of action accrues. 28 U.S.C. § 2401(a).[2] A civil action against the United States "accrues when a plaintiff knew or should have known of the wrong and was able to commence an action based upon that wrong." *Wild Fish Conservancy v. Salazar,* 688 F.Supp.2d 1225, 1233 (E.D.Wash.2010) (citing *Shiny Rock Mining Corp. v. United States,* 906 F.2d 1362, 1364 (9th Cir.1990)). The Miccosukee Tribe does not contest that § 2401(a)'s six year statute of limitations applies to this action. *See* Pl.'s Resp. in Opp. to Def.s' Mot. for Summ. J. at 23–27 ("Pl.'s Resp.") (dkt. # 144).[3] Rather, the Miccosukee Tribe asserts that its equal protection claim is based on actions that took place in 2008. *Id.* at 25 (stating that "[t]his lawsuit is predicated upon the Corps' actions in 2008"). Specifically, Plaintiff asserts that its equal protection claim is based on "failure to seek a deviation in July of 2008 from the date they were supposed to open the gates under the IOP, and failure to follow the IOP procedure when denying the Tribe's request to keep them open in

October, 2008." *Id.* at 26. Given that the Miccosukee Tribe concedes that its equal protection claim stems from conduct that occurred exclusively in 2008, it could not be barred by res judicata based on actions that were filed in 2002 and 2005. *Id.* at 24 (stating that the "underlying facts on which the present action is based did not exist at the time the [2002 and 2005] actions were filed"); *see* Case No. 02–22778–CIV–MOORE and Case No. 05–23045–CIV–MOORE. Accordingly, the Federal Defendants' argument that the instant matter is barred by res judicata is without merit.[4]

## C. Equal Protection Claim

■■■ The Federal Defendants claim that they are entitled to summary judgment on the Tribe's equal protection claim. It bears mentioning that the basis of the Miccosukee Tribe's equal protection claim is limited to: (1) the Corps' decision to postpone opening the S–12A gate from July 15, 2008, to July, 24, 2008; and (2) the Corps' refusal of the Tribe's request to leave the S–12A gate open after November 1, 2008. The first step in adjudicating a Fifth Amendment equal protection claim is to determine the applicable level of scrutiny. *Nat'l Parks Conservation Ass'n v. Norton,* 324 F.3d 1229, 1244 (11th Cir. 2003).[5] When the government creates a suspect classification that distinguishes people along lines of race or alienage, that classification is subject to strict scrutiny. *Id.*; *see Grutter v. Bollinger,* 539 U.S. 306, 326, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003)

---

**2.** This six year statute of limitations excludes the Contract Disputes Act of 1978.

**3.** Citation to the Parties' memoranda of law and statements of material fact incorporate by reference the underlying citations where applicable.

**4.** Although the Tribe's equal protection claim is based on conduct that occurred in 2008,

any equal protection claim arising from the Corps' water management actions that occurred prior to the 2005 case would be barred by the doctrine of res judicata.

**5.** The Equal Protection clause of the Fourteenth Amendment has been reverse-incorporated into the Fifth Amendment's Due Process Clause. *Bolling v. Sharpe,* 347 U.S. 497, 499–500, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

(stating that "all racial classifications imposed by government must be analyzed by a reviewing court under strict scrutiny"). Under strict scrutiny, a classification is unlawful unless "(1) the racial classification serves a compelling governmental interest, *and* (2) it is narrowly tailored to further that interest." *Johnson v. Bd. of Regents,* 263 F.3d 1234, 1244 (11th Cir.2001) (citing *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)) (emphasis in original). When a classification is based on gender, a quasi-suspect class, it is subject to intermediate scrutiny. *Nat'l Parks,* 324 F.3d at 1244. Under intermediate scrutiny, a "preference may be upheld so long as it is substantially related to an important governmental objective." *Id.*

When a classification does not involve a suspect or quasi-suspect classification, it is subject to rational-basis scrutiny. *Id.* at 1245. Under rational basis review, the classification must bear a rational relation to some legitimate end. *Id.* In determining whether there is a rational relation to a legitimate end:

> The first step ... is identifying a legitimate government purpose-a goal-which the enacting government body *could* have been pursuing. The *actual* motivations of the enacting governmental body are entirely irrelevant.... The second step of rational-basis scrutiny asks whether a rational basis exists for the enacting governmental body to believe that the legislation would further the hypothesized purpose. The proper inquiry is concerned with the *existence* of a conceivably rational basis, not whether that basis was actually considered by the legislative body. As long as reasons for the legislative classification may be have been considered to be true, and the rela-

tionship between the classification and the goal is not so attenuated as to render the distinction arbitrary or irrational, the legislation survives rational-basis scrutiny.

*Joel v. City of Orlando,* 232 F.3d 1353, 1358 (11th Cir.2000) (quoting *Haves v. City of Miami,* 52 F.3d 918, 921–22 (11th Cir. 1995)) (emphasis in original).

### 1. Level of Scrutiny

 This Court must determine if the Federal Defendants' challenged conduct falls within a suspect classification or if rational-basis scrutiny applies.[6] *See Nat'l Parks,* 324 F.3d at 1245 (applying rational-basis scrutiny to challenged federal agency action). A suspect classification is one that makes a distinction based on race or national origin. *Williams v. Pryor,* 240 F.3d 944, 947 (11th Cir.2001). For example, in *Adarand Constructors, Inc. v. Pena,* the Supreme Court held that strict scrutiny applied to the equal protection challenge brought by a subcontractor who submitted the lowest bid but was not awarded a federal contract because of a contract provision awarding additional compensation to a prime contractor who utilized subcontractors that were small businesses controlled by "socially and economically disadvantaged individuals." 515 U.S. at 205, 115 S.Ct. 2097. "Socially and economically disadvantaged individuals" included "Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities, or any other individual found to be disadvantaged by the [Small Business] Administration." *Id.*

The contractual provision at issue in *Adarand* was the product of a regulatory scheme that declares it to be "the policy of the United States that small business con-

---

6. No Party argues that the Federal Defendants' challenged conduct falls within a qua-si-suspect classification.

cerns, ... [and] small business concerns owned and controlled by socially and economically disadvantaged individuals, ... shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency." 15 U.S.C. § 637(d)(1). The Court held that the equal protection claim challenging the agency's action pursuant to this regulatory regime was subject to strict scrutiny because the relevant statutes and regulations explicitly drew distinctions based on race and national origin. *Adarand,* 515 U.S. at 238–39, 115 S.Ct. 2097; *see Johnson v. Bd. of Regents of Univ. of Ga.,* 263 F.3d 1234, 1243 (11th Cir.2001) (stating that admission policy awarding fixed numerical bonus to non-white students was subject to strict scrutiny); *Virdi v. DeKalb County Sch. Dist.,* 135 Fed.Appx. 262, 268 (11th Cir. 2005) (holding that Minority Vendor Involvement Program, intended to foster increased business opportunities between the school district and blacks and other minorities, was subject to strict scrutiny because it contained explicit racial classifications).

■ "When racial classifications are explicit, no inquiry into legislative purpose is necessary," and strict scrutiny applies. *Hunt v. Cromartie,* 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999). A facially neutral classification, on the other hand, warrants strict scrutiny only if it can be proved that the classification was established based on "a racial purpose or object, or if it is unexplainable on grounds other than race." *Id.* (internal citation and quotation marks omitted); *see Nat'l Parks,* 324 F.3d at 1244–45. A racial purpose or object exists when a decision maker selects "a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Holton v. City of Thomasville Sch. Dist.,* 425 F.3d 1325, 1349 (11th Cir.2005) (quoting *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)).

■ The nature of administrative action generally makes it difficult to ascertain the intent of the acting body. *Jean v. Nelson,* 711 F.2d 1455, 1485 (11th Cir.1983). A non-exhaustive list of the types of direct and circumstantial evidence that a Court may consider in determining whether an agency acted with a racial purpose or object includes: (1) whether the challenged conduct impacts one race more heavily than another; (2) the historical background of the decision; (3) the sequence of events leading up to the decision; (4) procedural defects in decision making and substantive departures in decision making; (5) legislative or administrative history; (6) foreseeability of discriminatory impact; (7) knowledge of discriminatory impact; and (8) the availability of less discriminatory alternatives. *Id.* at 1486 (citing cases); *see Arlington Heights v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

■ The Miccosukee Tribe challenges (1) the Corps' decision to postpone opening the S–12A gate from July 15, 2008, to July 24, 2008; and (2) the Corps' refusal of the Tribe's request to leave the S–12A gate open after November 1, 2008. Here, the Corps' challenged conduct does not involve an explicit racial classification because neither of its decisions were based on a statute, regulation, or plan that incorporates a distinction based on race or national origin. *See Nat'l Parks,* 324 F.3d at 1245 (applying rational-basis scrutiny to challenged federal agency action extending the leases of leaseholders within Biscayne National Park).[7] Therefore, the Corps' challenged

7. In *National Parks,* the Court concluded that rational-basis scrutiny was appropriate because, by extending the leases of the Stiltsville leaseholders, the National Parks Service created a classification comprised of those who

conduct is only subject to strict scrutiny if, taking the facts in the light most favorable to the Miccosukee Tribe, the Tribe can demonstrate that the Corps' challenged conduct was motivated by a racial purpose or object or if its decisions are unexplainable on grounds other than race. The Miccosukee Tribe contends that the Corps has flooded WCA 3A for the purpose of protecting non-Indian lands from flooding. As stated above, this assertion must be limited to the Corps' challenged conduct relevant to its decisions to postpone opening the S-12A gate from July 15, 2008, to July 24, 2008, and its refusal of the Tribe's request to leave the S-12A gate open after November 1, 2008.[8]

### a. Postponing Opening the S-12A gate from July 15, 2008, to July, 24, 2008

The Miccosukee Tribe claims that the Corps' decision to postpone opening the S-12A gate for nine days after July 15, 2008, was motivated by a racial purpose or object or is unexplainable on grounds other than race. To determine the validity of this claim, this Court must review the basis of the Corps' decision to leave the S-12A gate open. On May 15, 2008, a large fire began in Everglades National Park in the vicinity of subpopulation A of the Cape Sable seaside sparrow (the "sparrow"),[9] which ultimately affected over 2000 acres of land. Def.s' Ex. 19, Decl. of Sean Smith, Chief of Water Resources Engineering Branch, Jacksonville District, U.S. Army Corps of Engineers ¶ 9 ("Smith Decl.") (dkt. # 129-9). The Fish and Wildlife Service ("FWS") requested that the S-12A gate opening, scheduled for July 15, 2008, be postponed to help alleviate the fire's impact on the habitat of subpopulation A of the sparrow. *Id.*

In a July 11, 2008, teleconference, the Corps, FWS and Everglades National Park decided to postpone opening the S-12A gate for nine days until July 25, 2008. *Id.* The stated reason for the delay was based on observations that five sparrow nests in subpopulation A were active. Def.s' Ex. 22, Memo. for Record, dated July 15, 2008, at 1 (dkt. # 130-2). Of these nests, two had incubating eggs laid as recently as six days prior to the last observation on July 10, 2008. *Id.* Given a total time for fledging of 22 days (11 days for incubation and 10 days in the nest), the Corps, FWS and Everglades National Park concluded that the nesting should be complete by July 25, 2008. *Id.*

The FWS and Everglades National Park biologists also considered the potential need to avoid flooding until sufficient post-fire vegetation regrowth had occurred to survive increased water levels. *Id.* The biologists determined that the vegetation

---

are Stiltsville leaseholders and those who are not. 324 F.3d at 1244–45. Here, when the Corps opens and closes the S-12A gate, it creates a classification comprised of those who are situated above and below the structure who are affected by the changes in water levels caused by the flow of water through the gate.

8. The Miccosukee Tribe's arguments in support of its equal protection claim rely on the Corps' conduct going back to 1998. The Tribe's equal protection claim is limited to the challenged conduct that occurred in 2008. Thus, no prior conduct will be construed as forming the basis of the Tribe's equal protection claim. To the extent that the Corps' water management actions since 1998 have relevance as part of the sequence of events leading up to the challenged conduct that occurred in 2008, they may be considered in determining whether the Corps acted with a racial purpose or object or if its decisions are unexplainable on grounds other than race. *See Jean,* 711 F.2d at 1485.

9. The sparrow is protected by the Endangered Species Act and represents one out of eight subspecies of North American seaside sparrow.

would have reached a sufficient height to avoid the adverse effects of flooding by July 25, 2008. *Id.* The biologists also considered whether it would be necessary to increase the flow of water through the S–12A gate after it was opened on July 25, 2008, to make up for the additional nine days that it had been closed. *Id.* They concluded that this was unnecessary, based on the fact that the total volume of water passing through S–12A is approximately 10% of the total flow through the S–12 gates, and that the flows could be increased through the other S–12 gates to ensure that the total flows would comply with the requirements of the Rainfall–Based Management Plan. *Id.* at 1–2.

This account of the reasons upon which the Corps, FWS and Everglades National Park based their decision to leave the S–12A gate closed from July 15, 2008, to July 24, 2008, is undisputed by direct evidence. The time required for the sparrows to fledge is consistent with the amount of time that the Corps left the S–12A gate closed. The time that the S–12A gate was closed was no more than necessary to facilitate the fledging of the sparrows and no additional time was added to ensure that the post-fire vegetation could survive increased water levels. The narrow tailor-

ing of the Corps' actions to the protection of sparrow nesting supports the conclusion that the Corps left the S–12A gate closed to protect the sparrow and not for any other invidious reason. Accordingly, the reasons underlying the Corps decision to leave the S–12A gate closed do not support the inference that it acted with racial object or purpose, or that its decision cannot be supported on grounds other than race.

The Corps' decision to leave the S–12A gate closed was not procedurally defective. The Corps asserts that it properly exercised its discretion to postpone opening the S–12A gate. In postponing opening the S–12A gate, the Corps did not seek a deviation from the Interim Operation Plan ("IOP"), as might have otherwise been required, because it concluded that it had sufficient operational flexibility pursuant to the 2002 Interim Operational Plan for the Protection of the Cape Sable seaside sparrow ("IOP") and Term and Condition 3 of the 2006 Biological Opinion ("BiOp 2006").[10] Def.s' Ex. 23, Email from Sean Smith, Chief of Water Resources Engineering Branch, Jacksonville District, U.S. Army Corps of Engineers to Joette Lorion, Environmental Consultant to the Miccosukee Tribe, and other recipients,

10. "In the early 1980's Congress authorized a restructuring of the Corps' water management system in order to restore wildlife in the Everglades." *Miccosukee v. United States,* 566 F.3d 1257, 1263 (11th Cir.2009). A series of trial and error tests were conducted. One of these tests, called Test 7, was conducted in 1995 and was scheduled to last four years. *Id.* Under Test 7, large amounts of water were released through the S–12 gates, located just north of the Everglades. *Id.* In 1998, the Corps and FWS, with whom the Corps collaborates, began to modify the water management activity in response to a serious decline in the sparrow population. *Id.* The sparrow relies on low water levels below the S–12 gates during its nesting season. *Id.* at 1262. The Everglade snail kite, another endangered species, relies on steady and moder-

ate to low water levels above the S–12 gates to ensure the availability of the apple snail, its primary forage. *Id.* When the S–12 gates are open, the water level below the gates rises, negatively impacting the sparrow. *Id.* When the gates are closed, water builds up behind the gates, negatively impacting the snail kite. *Id.* FWS issued biological opinions in 1999, 2002, and 2006, analyzing the ecological impacts of the water management actions. Between 1999 and 2002, the Corps and FWS collaborated to develop the Interim Operational Plan for the Protection of the Cape Sable seaside sparrow ("IOP"). *Id.* The IOP sets forth procedures for water management activities and provides for the monitoring and management of environmental impacts. The Corps has operated under the IOP since 2002.

dated 8/19/2008 at 4:33:45 p.m. EDT (dkt. # 130–3). Term and Condition 3 of the BiOp 2006, states: "If fire occurs within [sparrow] Subpopulation A habitat, the Corps will coordinate with [FWS] and seek a deviation from the WCA 3A regulation schedule to ameliorate impacts to [sparrow] habitat, as necessary." Pl.'s Ex. 58, BiOP 2006 at 79 (dkt. # 145–56). Term and Condition 3 authorizes the Corps and FWS to seek a deviation from the WCA 3A regulation schedule if such a deviation is necessary to mitigate the effects of a fire. Of course, it follows that the Corps and FWS need not seek a deviation when taking mitigating action that is already within the scope of the WCA 3A regulation schedule.

Table ES–1, Alternative 7R Operations, provides that the S–12A gate must be closed each year from November 1 until July 15. Def.s' Ex. 17, Final Supplemental Environmental Impact Statement, Interim Operation Plan (IOP) for Protection of the Cape Sable Seaside Sparrow 2006 at ix (dkt. # 129–7). It further provides that after July 15, the WCA 3A regulation schedule must be followed. *Id.* The WCA 3A regulation schedule provides a zoned regulation schedule accompanied by operational guidelines that facilitate the discharge of a specified amount of water from WCA 3A. Def.s' Ex. 16, WCA 3A regulation schedule (dkt. # 129–6). On July 16 of each year, water levels above approximately 10.25 feet fall within Zone A of the WCA 3A regulation schedule. *Id.* On October 31 of each year, water levels above approximately 10.75 fall within Zone A. *Id.* When water levels fall within Zone A during this period, the WCA 3A regulation schedule provides that the S–12 gates are "[o]pen full when permitted subject to conditions of note 1 below." [11] *Id.*

The WCA 3A regulation schedule is applied in conjunction with the Rainfall-Based Management Plan, contained in the Water Control Plan, which creates a plan for discharging two categories of water. Def.s' Ex. 6, Water Control Plan for Water Conservation Areas—Everglades National Park and ENP—South Dade Conveyance System at T7–1, 2 (the "Water Control Plan") (dkt. # 128–6). The first category is a rainfall response component, which is calculated using a rainfall formula amount. *Id.* at T7–1. The second category is a WCA 3A regulatory component, which is calculated by determining the distance in feet that the water level in WCA 3A is above Zone E of the WCA 3A regulation schedule and multiplying that by 2500 cubic feet per second. *Id.* at T7–1, 2. The Water Control Plan also provides that the goal is to facilitate 45% of water discharge from WCA 3A from the S–12 gates and 55% of the discharge from the S–333 gate. *Id.* at T7–2.

Based on the foregoing, the Corps' position is that from July 16 to October 31, it can utilize the S–12 gates however it sees fit to meet the Rainfall–Based Management Plan's discharge requirements according to the distribution requirements between the S–12 and S–333 gates. Def.s' Resp. to Order to Show Cause at 5 (dkt. # 166). In other words, although the Corps is required to keep the S–12 gate closed from November 1 to July 15, pursuant to Table ES–1, Alternative 7R Operations, there is no requirement as to whether the S–12A gate must be open or closed from July 16 to October 31, and the Corps may utilize the S–12 gates however it sees fit to meet the discharge requirements in the specified proportions between the S–12 and S–333 gates. The Corps interprets the WCA 3A regulation schedule's statement that S–12 gates are to be "[o]pen full when permitted" as providing it with the operational flexibility to utilize the S–12

---

11. Neither party argues that the conditions of note 1 are relevant here.

gates as it sees fit to accomplish the required objectives. Def.s' Resp. to Order to Show Cause at 5.

The Miccosukee Tribe has not explicitly contested the Corps' interpretation of "[o]pen full when permitted." *See* Pl.'s Resp. to Order to Show Cause (dkt. # 167). However, "[o]pen full when permitted" could also mean that the S–12 gates must be fully open when permitted by the conditions in note 1. Even so, the Corps' interpretation is a reasonable one and it acted pursuant to its interpretation in concluding that leaving the S–12A gate closed for an additional nine days did not require it to seek a deviation. Even if the Corps' interpretation is wrong and it was actually required to seek a deviation, its error was a reasonable one and is not the type of procedural defect that supports the inference that the Corps postponed opening the S–12A gate because of a racial object or that its decision is unexplainable on grounds other than race.[12]

The Corps' decision to leave the S–12A gate open an additional nine days did not impact the Miccosukee Tribe more heavily that any other individual or group. This is because minor adjustments in water management activities by their very nature move water from one place to another, decreasing the amount of water at the source and increasing the amount of water at the destination. There is perhaps a threshold at which such actions could be so

unmistakably disadvantageous to an individual or group, absent a legitimate reason by the decision maker, so as to support the inference that the decision was made with a racial purpose or object, or that the decision cannot be explained on grounds other than race. On the other hand, when a discrete water management decision has a de minimus impact on total water management activities in a given year, and therefore a de minimus impact on any individual or group affected by the action, such action does not, without more, support the inference that the challenged conduct was taken with a racial purpose or object, or that it is unexplainable on grounds other than race.

It is unclear what action, if any, was actually taken to increase flow out of the other S–12 gates to compensate for the additional nine-day closure of the S–12A gate. However, the undisputed fact that the flow through the S–12A gate was only a small portion of total flow through the S–12 gates is evident when referencing the water levels in WCA 3A during this period. Based on the three station daily averages, water levels in WCA 3A increased steadily before, during and after the period from July 15 to July 24, 2008. Smith Decl. at 12. Beginning in June of 2008, water levels in WCA 3A increased as follows: June 16 to June 30—.34 feet; July 1 to July 15—.44 feet; July 16 to July 31—.36 feet;

---

**12.** In response to a 7000 acre fire in Everglades National Park that occurred in 2008, FWS requested a deviation from the IOP to permit the Corps to increase the amount of water discharged from the S–12D gate, which was already open, by 500 cubic feet per second from May 18 to May 23, 2008, to help prevent the fire from spreading. Pl.'s Ex. B–29, Emergency Deviation Memo (dkt. # 145–36). An Environmental Assessment was prepared, which concluded that the increased discharges through the S–12D gate would have no significant adverse impact. The Tribe contends that the Corps decision to seek

a deviation to increase the amount of water discharged from the S–12D gate, while later concluding that it was not required to seek a deviation to leave the S–12A gate open after July 15, is proof that the Corps acted with a racial purpose or object. However, John Zediak, Chief of Water Management Section, U.S. Army Corps of Engineers, stated in his deposition that the deviation was necessary because the additional discharges through the S–12D gate exceeded the discharge requirements of the Rainfall–Based Management Plan and the IOP. Pl.'s Ex. A–19, John Zediak Dep., Apr. 23, 2010, at 221 (dkt. # 145–19).

August 1 to August 15—.2 feet; August 16 to August 31—.75 feet; September 1 to September 15—.24 feet. Smith Decl. at 15–17.

Assuming, arguendo, that the S–12A gate had been opened on July 15, 2008, that the S–12A gate comprises 10% of total flow through the S12 gates, that 45% of water discharged from WCA 3A passes through the S12 gates,[13] and that no additional flow out of the other S–12 gates compensated for the loss of flow through S–12A during the nine days it was closed, the water level would still have likely increased .3528 feet, instead of .36 feet, a difference of only .0072 feet or .09 inches.[14] This Court recognizes that factors other than water flow out of the S–12 and S–333 gates affect water levels in WCA 3A, including inflows, rain and evaporation. This example illustrates, however, the limited impact that closing the S–12A gate for nine days may have on the water level in WCA 3A. This de minimus impact that the closure of the S–12A gate may have on water levels in WCA 3A is insufficient to support the inference that the Corps acted with a racial purpose or object or that its decision cannot be explained on grounds other than race.

The Miccosukee Tribe contends that the "long history of displacement and discrimination endured by Native Americans in general and the Miccosukee people in particular" is a component of the historical background of the Corps' decision to leave the S–12A gate closed for an additional nine days. Pl.'s Resp. at 34. There is, however, simply no demonstrable nexus between the pains inflicted on the Seminole and Miccosukee Tribes over the preceding centuries and the Corps' decision to leave the S–12A gate open. Although the historical background of a decision is a factor that may be considered in determining whether challenged conduct was taken with a racial purpose or object or if the conduct is unexplainable on grounds other than race, the relevant historical background of an agency decision is not so amorphous as to generally include the entirety of a centuries-old history of maltreatment.

Here, the relevant historical background includes, for example, the 1999, 2002 and 2006 biological opinions, the IOP, and the agency conduct associated with the creation and implementation of these documents and plans. The Miccosukee Tribe has brought numerous claims challenging the Corps' ongoing water management decisions and has been largely unsuccessful in demonstrating that Corps and other federal defendants have failed in meeting their constitutional and statutory obligations. Nevertheless, to the extent that it has prevailed on its claims, *see Miccosukee Tribe of Indians of Fla. v. United States*, 697 F.Supp.2d 1324, 1341–42 (S.D.Fla.2010) (holding that Federal Defendants' use of an ecological surrogate as to the sparrow was arbitrary and capricious), the relevant historical background does not support the inference that the Corps left the S–12A gate closed because

---

13. The target percentages of discharge from WCA 3A are 45% from the S–12 gates and 55% from the S–333 gate. Def.s' Ex. 6, Water Control Plan for Water Conservation Areas—Everglades National Park and ENP–South Dade Conveyance System at T7–2 (the "Water Control Plan") (dkt. # 128–6).

14. Calculated by multiplying the actual increase in water level from July 16–24 (.16 feet) by .45 (the percentage of water that passes through the S–12 gates) (.16 × .45 = .072 feet), decreasing that amount by 10% (.072 × .9 = .0648 feet), adding that to the actual increase in water level from July 16–24 multiplied by .55 (the amount of water that passes through the S–333 gate) (.16 × .55 = .088 feet) (.0648 + .088 = .1528 feet), and adding that to the actual change in water level from July 24–31 (.2 feet) (.2 + .1528 = .3528 feet).

of a racial object or purpose, or that its decision is unexplainable on grounds other than race.

Given the facts upon which the Corps, FWS and Everglades National Park based its decision to leave the S–12A gate closed for an additional nine days, there is no basis for concluding that there was any foreseeable or actual discriminatory impact. Moreover, there is no evidence that there was a less discriminatory alternative, particularly given the strong nexus between the extended closure of the S–12A gate and the protection of the sparrow, as well as the de minimus impact the extended closure had on water levels in WCA 3A. In light of the foregoing, the Miccosukee Tribe has failed to demonstrate that there is a genuine issue of material fact that the Corps' decision to leave the S–12A gate closed for nine additional days was made with a racial object or purpose, or that its decision is unexplainable on grounds other than race. Accordingly, rational-basis scrutiny applies to the Corps' decision to postpone the opening of the S–12A gate.[15]

b. Denial of the Tribe's Request to Leave the S–12A Gate Open After November 1, 2008

The Miccosukee Tribe claims that the Corps' denial of the Tribe's request to leave the S–12A gate open after November 1, 2008, was motivated by a racial purpose or object or is unexplainable on grounds

other than race. In a letter dated October 22, 2008, Billy Cypress ("Chairman Cypress"), the Tribal Chairman of the Miccosukee Tribe sent the Corps a letter requesting that it leave the S–12A gate open after the scheduled closing on November 1. Pl.'s Ex. B–25, Chairman Cypress letter to Col. Paul Grosskruger (dkt. # 145–32). The reasons expressed by Chairman Cypress in his letter to the Corps as to why the S–12A gate should be left open included damage to plant and animal life in WCA 3A, degradation of the Tribe's culture and way of life, and risk to the health and safety of Tribe members who live south of the S12 gates and L–29 levee. The Corps responded in a letter dated October 31, 2008, denying the Tribe's request to leave the S–12A gate open. Def.s' Ex. 25, Col. Paul Grosskruger letter to Chairman Cypress (dkt. # 130–5). In its letter, the Corps stated that its denial was based on the need to protect the sparrow and its habitat, the absence of any known danger to the Tribe's health or safety, and the fact that the Corps was taking other actions to offset the reduction of water discharge from WCA 3A caused by closing the S–12A gate.[16] Id.

The Miccosukee Tribe's health and safety concern was based on the danger posed to the integrity of the S–12 gates and the L–29 levee by high water levels in WCA 3A.[17] The Tribe contends that the engi-

---

**15.** The bulk of the Tribe's arguments in support of its equal protection claim refer to conduct dating back to 1998. The limitation of the Tribe's equal protection claim to the challenged conduct that occurred in 2008 moots a large part of the Tribe's substantive arguments. Moreover, many of the Tribe's arguments amount to de facto attacks on the validity of the 2006 BiOp and the IOP, claims which have already been, or are actively being, litigated and are beyond the scope of its equal protection claim.

**16.** Among other actions intended to reduce water levels in WCA 3A, the Corps stated that

reductions of S–11 releases into WCA 3A would offset the reduction of discharge from WCA 3A caused by closing the S–12A gate. Id.

**17.** The Federal Defendants assert that the Tribe should be precluded from arguing that the health and safety of Tribe members is endangered due to the risk that high water levels in WCA 3A pose to the integrity of the L–29 levee. Def.'s Reply in Supp. of Summ. J. at 13–14 (dkt. # 147) ("Def.s' Reply"). The Federal Defendants contend that any such arguments should be excluded because the Tribe failed to raise concerns about the L–29

neering cap on the S–12 structures, which must be maintained to prevent catastrophic failure and loss of human life, is 11.25 feet. Pl.'s Reply at 17 (citing Pl.'s Ex. B–15, Final Environmental Assessment 1998 Emergency Deviation from Test 7 ("1998 EA")) (dkt. 145–26). The Corps has submitted evidence, however, that the headwater elevation in WCA 3 A can be as high as 15 feet with a tailwater elevation of 10 feet without compromising the integrity of the S–12 structures, but that 12.4 feet should be used for the maximum allowable water surface. Decl. of Paul Stroup, Chief of the Structure Section, U.S. Army Corps of Engineers, Jacksonville, Fla. ¶¶ 5–6 (dkt. # 130–10).[18] Moreover, the Corps now disagrees that 11.25 feet is an appropriate engineering cap because it fails to take into account tailwater, an important factor because if the headwater and tailwater elevations are the same, no force is exerted on the structure. *Id.* ¶ 7.

Although the Parties disagree as to the correct maximum water levels that ensure the stability of the S–12 structures, the Miccosukee Tribe's evidence is comprised of the 1998 EA, a Corps document. Since the 1998 EA was issued, however, the Corps has changed its position as to the maximum water levels that the S–12 gates can safely support. The Tribe cannot independently rely on outdated evidence to support its position, particularly where there is no evidence, and it has not been suggested, that the Corps changed its position in anticipation of litigation. Accordingly, the Corps' decision to close the S–12A gate on November 1 according to WCA 3A regulation schedule, despite the Tribe's health and safety concerns related to the integrity of the S–12 gates, does not support the inference that the Corps acted with a racial purpose or object or that its decision is unexplainable on grounds other than race.

The Miccosukee Tribe's health and safety concern was also based on the danger posed by the structural integrity of the L–29 levee. Based on the available evidence, it is unclear if the Corps knows what the maximum water level is that the L–29 levee can support. John Zediak ("Zediak"), Chief of Water Management Section, U.S. Army Corps of Engineers, and Sean Smith ("Smith"), Chief of Water Resources Engineering Branch, U.S. Army Corps of Engineers, both of whom participated in the decision to close the S–12A gate on November 1, each testified in their depositions that they are unaware of any safety analysis concerning the integrity of the L–29 levee. Pl.'s Ex. A–20, Zediak Dep., Apr. 23, 2010, at 24 (dkt. # 145–20); Pl.'s

---

levee in its Complaint, interrogatory responses, or expert reports. *Id.* In its interrogatory responses, however, the Tribe stated: "High water levels in WCA 3A, especially during the storm and hurricane season, threaten the integrity of WCA 3A and the S–12 structures. If the integrity of the S–12 structures or the WCA 3A levee was compromised, it could cause disastrous flooding and safety implications in the area where the Miccosukee Tribe lives downstream of the levee." Def.s' Ex. 35, Pl.'s Resp. to Def.s' First Set of Interrogatories ¶ 14 (dkt. # 131–5). Given that the Miccosukee Tribe raised the health and safety concern stemming from the integrity of the L–29 levee, the Tribe's contention that the levee's failure poses a health and safety risk is

not excludable under Federal Rule of Civil Procedure 37(c)(1).

**18.** This structural analysis, completed in 2001, chronologically superseded the 11.25 engineering cap in the 1998 EA, as well as a 1995 stability analysis that estimated that S–12 structural integrity would be stable with a headwater elevation of 12.4 feet and a tailwater elevation of 7 feet. Stroup Decl. ¶¶ 3, 7. The 1995 and 2001 stability analyses also point out that the relevant maximum headwater levels could overtop the S–12 and S–333 gates, which have crown elevations of 11.0 feet and 14.66 feet respectively, without any harm to the structures. *Id.* ¶ 3, 5.

Ex. A–14, Smith Dep., Apr. 13, 2010, at 36, 203 (dkt. # 145–15).

The evidence suggests that the Corps decided to close the S–12A gate without knowing what water levels the L–29 levee would support, and that the decision makers relied on the fact that the L–29 levee has supported higher water levels in the past. Pl.'s Ex. A–19, Zediak Dep., Mar. 11, 2010, at 191–92 (dkt. # 145–19); Pl.'s Ex. A–14, Smith Dep., Apr. 13, 2010, at 210–11 (dkt# 145–15); *see* Smith Decl. ¶ 17 (stating that the water levels in WCA 3A on October 31, 1994 and 1995, were 11.99 and 12.47 feet). The Corps' reliance on historical water levels that did not result in the catastrophic collapse of the L–29 levee as a basis for concluding that the levee is structurally stable under similarly high water levels, absent information concerning the actual structural limits of the levee, does not seem to be a prudent way to prevent disaster.[19] Be that as it may, as discussed below in greater detail, leaving the S–12A gate open for an additional period would have had a de minimus impact on water levels in WCA 3A given the discharge capacity of the S–12A gate with respect to the other S–12 gates and the S–333 gate. Nevertheless, even in light of the limited discharge capacity of the S–12A gate, the absence of evidence concerning the Corps' knowledge of the structural limits of the L–29 levee and the Corps' decision to close the S–12A gate despite the absence of such information, provides at least a modicum of support for the inference that the Corps acted with a racial purpose or object or that its decision is unexplainable on grounds other than race.

The Miccosukee Tribe claims that the Corps' decision to close the S–12A gate on November 1 was procedurally defective because the Corps failed to consult with the Tribe Chairman as it was required to do. The IOP states, in relevant part:

The Chairman of the Miccosukee Tribe of Indians of South Florida or his designated representatives will monitor predicted rainfall and conditions in WCA 3A and other tribal lands. If the Tribe determines these conditions indicate jeopardy to the health or safety of the Tribe, the Chairman will make a recommendation to the Corps to change the operations of the S–12 structures or other parts of the system. The Corps will review the data and advise the appropriate agencies of the conditions, and the District Commander will personally consult with the Chairman prior to making a decision whether to implement the changes to the S–12 operations.

Pl.'s Ex. B–97, IOP 2006 at 40 (dkt. # 145–70). The Miccosukee Tribe notified the Corps of a health and safety concern in a letter dated October 22, 2008. Pl.'s Ex. B–25, Chairman Cypress letter to Col. Paul Grosskruger (dkt. # 145–32). There is no evidence that the District Commander consulted with the Tribe prior to making the decision to close the S–12A gate on November 1. Rather, the evidence suggests that the District Commander failed to consult with Tribe as the IOP required, although he left a voicemail for the Tribe Chairman on October 31, 2008.[20] Although there are many reasons this procedural defect could have occurred, the District

---

**19.** A request for funding to conduct a wind and wave analysis which would have included the L–29 levee was denied. Zediak Dep. at 18–21 (dkt. # 145–20).

**20.** Zediak did not have any knowledge of the District Commander consulting with the Tribe about whether to close the S–12A gate, except for a voicemail that the District Commander left on October 31, 2008, after the decision to close the gate had already been made. Zediak Dep. at 98, 99 (dkt. # 145–20). Smith did not know if the District Commander consulted with the Tribe Chairman prior to deciding to close the S–12A gate. Smith Dep. at 186–88 (dkt. # 145–15).

Commander's apparent failure to consult with the Tribe as required lends some additional support to the proposition that the Corps' decision to close the S12–A gate was based on a racial purpose or object or is unexplainable on grounds other than race.

The Miccosukee Tribe also argues that the Corps' decision to close the S–12A gate on November 1 as scheduled was procedurally defective because its request to postpone the closure was summarily denied without adequate consideration. As support for this contention, the Tribe points to a letter from the Corps denying the Tribe's request to leave the S–12A gate open that was drafted by the Corps before the Tribe made such a request. Pl.'s Ex. B–101, Draft Letter from Col. Alfred A. Pantano to Chairman Cypress (dkt. # 145–73). The Tribe argues that this anticipatory denial is evidence that the Corps denies its requests without considering them on the merits. The letter in question was drafted in anticipation that the Tribe would make a request to postpone the scheduled closure of the S–12A gate on November 1, 2009, although the Tribe never actually made such a request. Zediak Dep. at 70 (dkt. # 145–20). The Corps' position is that it believed the Tribe would make a request to leave the S–12A gate open in 2009, as it had done in the past. *Id.* at 69. Based on that belief, the Corps utilized the 2008 letter denying the Tribe's request to leave the S–12A gate open after November 1, 2008, as a template for a response to the anticipated renewal of the Tribe's request to leave the S–12A gate open after November 1, 2009. *Id.* at 69–70. The Miccosukee Tribe claims that this explanation belies the Corps' real intent to deny the Tribe's request without considering the merits of its request.

This Court views these facts and all factual inferences in the light most favorable to the Miccosukee Tribe. Even so, the evidence does not support the conclusion that the Corps intended to summarily deny the Tribe's anticipated request to leave the S–12A gate open after November 1, 2009. The fact that the Corps had prepared a draft letter denying the Tribe's anticipated request is not evidence that the Corps' anticipated denial failed to consider information pertinent to the decision. The October 22, 2008, letter that was used as a template discusses the facts relevant to the Corps' denial of the Tribe's request, including the fire that affected the habitat of subpopulation A, the water levels in WCA 3A during October of 2008, the large amount of rainfall since July of 2008, and listed the water management actions being taken to reduce the water level in WCA 3A, including maximizing releases out of the S–12B, S–12C and S–12D gates. Def.s' Ex. 25, Col. Paul Grosskruger letter to Chairman Cypress (dkt. # 130–5).

In the 2009 draft letter, on the other hand, the Corps discussed the lack of significant rainfall since September of 2009, the high recession rate of the water in WCA 3A, specific Rainfall Plan target flow amounts based on then current conditions, and the anticipated closure of the S–12A and S–12B gates, instead of just the S–12A gate. Pl.'s Ex. B–101, Draft Letter from Col. Alfred A. Pantano to Chairman Cypress (dkt. # 145–73). The Corps' consideration of these factors indicates that it was preparing to respond to the Tribe's anticipated request, and in doing so had begun the process of taking into account the factors relevant to reaching a decision. The Tribe never made any such request and so the decision making process never came to fruition, leaving only a draft, which by its very nature is preliminary to a final decision.

The existence of this draft, and its consideration of at least some facts that would have been relevant had the decision making process culminated in action, is not

evidence that the Corps intended to summarily deny the Tribe's request. On the contrary, it is evidence that the Corps was considering the merits of the Tribe's anticipated request. To find otherwise would create a presumption of bias whenever an agency begins the decision making process prior to a request by a third party seeking action on the same issue. Unless there is other evidence demonstrating that the agency's ultimate decision was made on impermissible grounds, no such finding of bias is warranted. Therefore, the existence of the 2009 draft letter does not support the conclusion that the Corps' decision to close the S–12A gate on November 1 was based on a racial purpose or object or is unexplainable on grounds other than race.

The Corps' denial of the Tribe's request to leave the S–12A gate open after November 1 did not impact the Miccosukee Tribe more than any other individual or group because it had a de minimus impact on water levels. As stated above, the flow through the S–12A gate was approximately 10% of total flow through the S–12 gates. Based on the three station daily averages, water levels in WCA 3A decreased steadily before, during and after November 1, 2008. Smith Decl. at 12. Beginning in October of 2008, water levels in WCA 3A decreased as follows: October 1 to October 15—.08 feet; October 16 to October 31—.28 feet; November 1 to November 15–.33 feet; November 16 to November 30–.43 feet; December 1 to December 15–.24 feet. Smith Decl. at 18–19.

Assuming, arguendo, that the S–12A gate remained open until December 15, that the S–12A gate comprises 10% of total flow through the S12 gates, and that 45% of water discharged out of WCA 3A goes through the S–12 gates, the water level would have likely decreased 1.421 feet, instead of 1.36 feet, a difference of .061 feet or .73 inches.[21] This Court recognizes that factors other than water flow out of the S–12 and S–333 gates affect water levels in WCA 3A, including inflows, rain and evaporation. This example illustrates, however, the limited impact that leaving the the S–12A gate for another 45 days may have had on the water level in WCA 3A. The de minimus impact of postponing the closure of the S–12A gate for another 45 days is insufficient to support the inference that the Corps acted with a racial purpose or object or that its decision cannot be explained on grounds other than race.

Given the facts upon which the Corps based its decision to close the S–12A gate according to the WCA 3A regulation schedule, there is no basis for concluding that there was any foreseeable or actual discriminatory impact. As discussed above in section III(C)(1)(a) of this Order, the historical background of the Corps decision to close the S–12A gate does not support the conclusion that it was taken with a racial purpose or object. Moreover, there is no evidence that there was a less discriminatory alternative, particularly given the de minimus impact the closure had on water levels in WCA 3A. In light of the foregoing, including weighing the factors that militate slightly in favor of the Tribe, and viewing the facts and all factual inferences in favor of the Miccosukee Tribe, the Tribe has failed to demonstrate that there is a genuine issue of material fact that the Corps' decision to close the S–12A gate on November 1 was made with a racial object

21. Calculated by determining the total change in water level from November 1 to December 15 (1.36 feet), multiplying it by .45 (the percentage of water that flows through the S–12 gates) (1.36 × .45 =.612 feet), increasing that amount by ten percent (.612 × 1.1 = .6732), and adding that to the total change in water level from November 1 to December 15 (1.36 feet), multiplied by .55 (the percentage of water that flows through the S–333 gate) (1.36 × .55 = .748) (.6732 + .748 = 1.421).

or purpose, or that the decision is unexplainable on grounds other than race. Accordingly, rational-basis scrutiny applies to the Corps' decision not to postpone the closure of the S–12A gate.[22]

### 2. Rational–Basis Scrutiny

Under rational basis review, the Corps' challenged conduct must bear a rational relation to some legitimate end. *Nat'l Parks*, 324 F.3d at 1245. In determining whether the Corps' challenged conduct survives rational-basis scrutiny, this Court must determine if there is a legitimate goal the Corps could have been pursuing and whether there is a nexus between the challenged conduct and the achievement of its goal. *Joel*, 232 F.3d at 1358. In conducting this analysis, it is only necessary to identify a goal the Corps could have been pursuing, without respect to whether the Corps was actually pursuing this goal when it engaged in the challenged conduct.

 The Corps left the S–12A gate open from July 15 to July 24, 2008, to protect the fledging of the sparrows and to mitigate the effects of the fire. This is a legitimate goal and the closure of the S–12A gate directly furthered the Corps' goal of protecting the sparrow by keeping water levels low in the relevant area during that period. The closure of the S–12A gate on November 1 was taken pursuant to the WCA 3 A regulation schedule, which in conjunction with the IOP, the BiOp 2006, and other related documents, assists the Corps in achieving its water management obligations in compliance with federal statutory requirements, including the Endangered Species Act. This is a legitimate goal and closure of the S–12A gate on November 1 directly furthered the goal of permitting the Corps to execute its water management obligations. Therefore, the Corps' challenged conduct survives rational-basis scrutiny. Accordingly, summary judgment on the Miccosukee Tribe's equal protection claim is warranted in favor of the Federal Defendants.[23]

---

**22.** The Federal Defendants raised multiple challenges to the Miccosukee Tribe's standing to bring its claims in this action, each of which this Court denied. At no time did the Federal Defendants postulate their standing challenges by arguing that there is an absence of injury in fact based on the quantitatively de minimus changes in water levels that would have resulted had the Corps opened the S–12A gate on July 15, 2008, and left the S–12A gate open after November 1, 2008. Any of the Tribe's future challenges to one of the Corps' discrete water management actions that does not constitute final agency action, in which a component of the harm concerns water levels, may require scrutiny of changes in water levels in quantitative terms as a factor in determining whether there has been an injury in fact.

**23.** A number of the Parties' arguments sound in a "class of one" equal protection claim. A "class of one" claim is one in which a plaintiff alleges that he has intentionally been treated differently from others who are similarly situated and that there is no a rational basis for the difference in treatment. *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1315 (11th Cir.2006). Thus, this type of claim does not require discrimination based on membership in a vulnerable class. *Id.* at 1313. To succeed on a "class of one" claim, a plaintiff must show that "(1) [he] was treated differently from other similarly situated persons; and (2) the defendant unequally applied the facially neutral statute for the purpose of discriminating against the plaintiff." *Strickland v. Alderman*, 74 F.3d 260, 264 (11th Cir.1996). One unifying theme of the Tribe's arguments is that they have been treated less favorably than non-Native Americans because they are Native Americans. Given that this is the primary basis of the bulk of the Tribe's arguments, this Court does not construe the Tribe's equal protection claim a "class of one" claim and the Tribe has not explicitly characterized it as such. However, in their briefs, both sides have borrowed elements from the traditional equal protection analysis as well as from the "class of one" analysis. To the extent that the Tribe may later seek to argue its claim under the "class of one" standard, and without determining

## IV. CONCLUSION

For the foregoing reasons, it is

ORDERED AND ADJUDGED that Defendants' Motion for Summary Judgment (dkt. # 134) is GRANTED. The Clerk of the Court is instructed to CLOSE this case. All pending motions are DENIED AS MOOT.

who would comprise a similarly situated person under these facts, summary judgment on a "class of one" claim is nevertheless warranted in favor of the Federal Defendants. The Tribe has failed to establish a genuine issue of material fact as to whether the Corps engaged in the challenged conduct for the purpose of discriminating against the Tribe,

for the reasons stated in sections III(C)(1)(a) and (b) of this Order.